UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| FRESHUB, INC. and FRESHUB, LTD., <br><br> Plaintiffs, <br><br> v. <br><br> AMAZON.COM, INC., a Delaware Corporation, AMAZON.COM SERVICES LLC, a Delaware Limited Liability Company, PRIME NOW, LLC, a Delaware Limited Liability Company, and WHOLE FOODS MARKET SERVICES, INC., a Texas Corporation, <br><br> Defendants. | Case No. 1:19-CV-00885-ADA <br> **Public Version** |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
OF INEQUITABLE CONDUCT**

**TABLE OF CONTENTS**

Page

I. INTRODUCTION --------------------------------------------------------------------------------- 1

II. FACTUAL BACKGROUND -------------------------------------------------------------------- 1

III. ARGUMENT ------------------------------------------------------------------------------------- 5

    A. The statement that Ikan never intended to abandon the '291 application was material to the Patent Office's decision to revive that application ------------- 6

    B. Ikan's statement that its entire five-year delay in responding to the June 2011 office action was "unintentional" was false -------------------------------------- 7

    C. Ikan made the false material statement to deceive the Patent Office ---------------- 8

    D. Ikan's inequitable conduct during the prosecution of the '291 application infects the continuation patents in this case ------------------------------------------- 11

IV. CONCLUSION --------------------------------------------------------------------------------- 12

# TABLE OF AUTHORITIES

**Cases:**                                                                                                                    **Page(s):**

*3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.*,
    228 F. Supp. 3d 1331 (N.D. Ga. 2017) ............................................................................. 10

*Agfa Corp. v. Creo Prods. Inc.*,
    451 F.3d 1366 (Fed. Cir. 2006) ..................................................................................... 11–12

*Barry v. Medtronic, Inc.*,
    245 F. Supp. 3d 793 (E.D. Tex. 2017), *aff'd*, 914 F.3d 1310 (Fed. Cir.
    2019), *cert. denied*, 140 S. Ct. 869 (2020) ........................................................................ 6, 9

*Consol. Aluminum Corp. v. Foseco Int'l, Ltd.*,
    910 F.2d 804 (Fed. Cir. 1990) ....................................................................................... 11–12

*Dippin' Dots, Inc. v. Mosey*,
    476 F.3d 1337 (Fed. Cir. 2007) ............................................................................................ 9

*FMC Corp. v. Manitowoc Co.*,
    835 F.2d 1411 (Fed. Cir. 1987) ......................................................................................... 8–9

*Fox Indus. v. Structural Pres. Sys.*,
    922 F.2d 801 (Fed. Cir. 1990) ............................................................................................ 11

*In re Rembrandt Techs. LP Patent Litig.*,
    899 F.3d 1254 (Fed. Cir. 2018) .................................................................................. 6–8, 11

*In re Rosuvastatin Calcium Patent Litig.*,
    703 F.3d 511 (Fed. Cir. 2012) .............................................................................................. 6

*Molins PLC v. Textron, Inc.*,
    48 F.3d 1172 (Fed. Cir. 1995) ........................................................................................... 8–9

*Therasense, Inc. v. Becton, Dickinson & Co.*
    649 F.3d 1276 (Fed. Cir. 2011) ......................................................................................... 8-9

*Tolan v. Cotton*,
    572 U.S. 650 (2014) ............................................................................................................. 6

**Fed. Regulations & Rules:**

37 C.F.R. § 1.137 ......................................................................................................................... 6

37 C.F.R. § 1.137(a) ............................................................................................................... 6, 10

37 C.F.R. § 1.53(b) ..................................................................................................................... 12

*Page(s):*

37 C.F.R. § 11.18(b)(2) -------------------------------------------------------------------------------- 9

Fed. R. Civ. P. 56(a) ----------------------------------------------------------------------------------- 5

**Other Authorities:**

M.P.E.P. § 201.07 ------------------------------------------------------------------------------------ 12

M.P.E.P. § 711.03(c), (II)(C)(1) -------------------------------------------------------------------- 7

## I.   INTRODUCTION

Plaintiffs Freshub, Inc. and Freshub, Ltd. (collectively, "Freshub") assert four related patents against Amazon.com, Inc., Amazon.com Services LLC, Prime Now, LLC, and Whole Foods Market Services, Inc. (collectively, "Amazon").[1]  The patents all spring from a common parent application that was originally assigned to Ikan Technologies, Inc.  That application, directed to a smart refrigerator, was abandoned during prosecution by failure to respond to a final Office Action rejecting the claims.  Ikan explicitly confirmed its knowledge of the abandonment in a writing signed by Sony Douer, a named inventor and Ikan's principal.  After Amazon released the accused technology—the virtual voice assistant Alexa—Ikan petitioned to revive the application, stating that its entire *five-year* delay in responding to the final Office Action was "unintentional."  The statement was false, Ikan made it to deceive the Patent Office, and the Patent Office relied on it to grant revival.  After the revival, Ikan proceeded to file several continuation applications, added claims directed to voice shopping, and requested expedited prosecution.  And shortly after the new patents issued, Ikan assigned them in exchange for a 50% share of Freshub and agreed to have Freshub file this lawsuit.  Because the applicant's conduct was inequitable, the Court should grant this motion for summary judgment finding the asserted patents unenforceable.

## II.   FACTUAL BACKGROUND

The asserted patents claim the idea of voice shopping, *i.e.*, ordering items using voice commands.  The patents share a specification and title, and claim priority to a common parent, U.S. Patent No. 9,821,344 ("the '344 patent").  Ikan Technologies Inc. filed the application that matured into the '344 patent, No. 11/301,291 ("the '291 application"), in 2005.  The Patent Office published

---

[1] U.S. Nos. 9,908,153 ("the '153 patent"), 10,213,810 ("the '810 patent"), 10,232,408 ("the '408 patent"), and 10,239,094 ("the '094 patent") (collectively, the "asserted patents").

the '291 application on August 10, 2006. (Ex. 1.[2]) The application originally contained claims related to voice shopping, but Ikan cancelled them in response to an Office Action. (Ex. 2 at KNOBBE-000604.) Ikan amended the application to focus on a refrigerator with a camera that could recognize product images. (*Id.* at 604-607.)

After prosecuting the '291 application for several years, Ikan abandoned it. The Patent Office issued its Office Action rejecting the claims on June 6, 2011 (Ex. 3), and Ikan did not respond by the deadline to continue prosecution (Ex. 4 (Weiss Dep.) at 92:18-20). After six months, on January 3, 2012, the Patent Office sent a Notice of Abandonment. (Ex. 5; Weiss Dep. at 93:2-7.) The prosecuting attorney, David Weiss of Knobbe Martens LLP, received both the rejection and the abandonment notice for Ikan. (Weiss Dep. at 91:15-92:8, 93:2-7.) Mr. Weiss testified that he forwarded material Patent Office communications like these to his clients, and that he would not allow an application to go abandoned without his client's express approval. (*Id.* at 37:10-23, 23:23-24:9, 24:14-22.) Ikan and Mr. Weiss took no action in response to the abandonment notice and allowed the '291 application to go abandoned. (*Id.* at 92:5-20.)

Ikan confirmed that it knew and intended to abandon the application on December 4, 2012. On that date, Ikan transferred its patent rights to a different Ikan entity, Ikan Holdings, LLC, in an assignment eventually recorded at the Patent Office. (Ex. 6 (Dec. 4, 2012 Assignment).) Mr. Weiss prepared the assignment document and Sony (Sion) Douer, Ikan's principal and a named inventor on the application, represented both entities in the transaction and signed the document before a notary on behalf of Ikan Technologies. (*Id.*; Weiss Dep. at 101:25-102:7, 103:3-19, 103:23-104:2.) The assignment included lists of issued patents and pending applications, as well

---

[2] All exhibit references are to the Declaration of Todd Gregorian in Support of Defendants' Motion for Summary Judgment of Inequitable Conduct, filed herewith.

as a list of "Inactive/Abandoned/Expired" applications. (Ex. 6.) The "Inactive/Abandoned/Expired" section included the '291 application. (*Id.*)

The '291 application remained abandoned for over five years. During that time, Amazon released the accused Alexa Voice Service to great success. Alexa is a voice-activated virtual assistant that Amazon launched with the accompanying Echo Smart Speaker in 2014. (Ex. 7 ("Love Dep.") at 45:4-9.) Alexa was the first far-field voice service in the market: Alexa would understand requests made in a crowded room from a distance and provide answers to questions about nearly unlimited topics such as stocks, weather, trivia, and the like. (Ex. 47 (Krishnan Dep.) at 150:2-151:13; Love Dep. at 120:6-122:5; Ex. 48 (Ambrosini Dep.) at 70:3-72:13; Ex. 51.) Alexa could also perform tasks in response to voice commands, like playing music and reading emails. (Love Dep. at 120:6-122:5.) And Amazon customers could use Alexa to place orders on Amazon.com. (Love Dep. at 307:4-11.) Alexa became touted for its convenience and innovation. (Ex. 8.) By February 2017, Forbes predicted that Echo sales would double from 11 million units in 2016 to 22 million units in 2017. (Ex. 9.)

While Knobbe Martens prosecuted Ikan's patents, it also prosecuted key Alexa patents for Amazon. For example, from December 2012 through September 2015, Knobbe Martens worked on four Amazon applications concerning voice command and speech recognition technology. (Exs. 10-13.) These include a patent for a system designed to recognize a user's voice request and then identify a corresponding action (Ex. 14 (US13/723,026) at 0011-12; Ex. 10 (US 8,977,555) at col. 3:47-48, 12:17-21), as well as a patent for interpreting voice commands to determine if a user would like to listen to or buy a song (Ex. 11 (US 9,070,366) at col. 9:32-35). Mr. Weiss received reports that summarized these applications. (Weiss Dep. at 52:13-53:2.)

While the '291 application was abandoned, Mr. Weiss worked on six other patent applications for Ikan involving multiple office actions and responses. (Exs. 26-31 (Applications

3

12/982,445; 13/303,577; 13/912,555; 14/505,078; 14/505,166; 14/841,960); Weiss Dep. at 138:24-139:2, 141:6-22.) Mr. Douer is a named inventor of application number 13/912,555 and helped to prosecute it. (Ex. 28; Ex. 49 (Sept. 30, 2014 Declaration & Assignment).) And Mr. Douer had transferred application number 13/303,577 from Ikan Technologies to Ikan Holdings in the same assignment acknowledging the '291 application as abandoned. (Ex. 6.)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ And on January 20, 2017—*over five years* after Ikan knowingly and intentionally abandoned the '291 application and after Amazon had become a major provider of voice shopping technology—Ikan petitioned the Patent Office to revive the application, claiming that it had never intended to abandon its prosecution. (Ex. 16 (Jan. 20, 2017 Revival Petition).) In the petition, Mr. Weiss swore under penalty of perjury that the entire five-year delay in responding to the Patent Office's last rejection was "unintentional." (*Id.*) And the Patent Office expressly relied on this statement. In granting the revival petition, it stated:

> This application has been abandoned for an extended period of time. The U.S. Patent and Trademark Office is relying on petitioner's duty of candor and good faith and accepting the statement that "the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to 37 CFR 1.137 was unintentional."

(Ex. 17 at KNOBBE-000704.) The Patent Office also noted that the applicant is "obligated under 37 CFR 11.18 to inquire into the underlying facts and circumstances when providing the statement required by 37 CFR 1.137." (*Id.*) The same day Weiss filed the petition to revive, he also recorded the assignment document Mr. Douer signed in December 2012 that acknowledged the abandonment of the '291 application. (Exs. 6, 16; Weiss Dep. 113:5-114:15.)

With the refrigerator patent application revived, Ikan and Mr. Weiss filed several continu-

4

ation applications replacing the smart refrigerator claims with voice shopping claims, and requested that the Patent Office expedite prosecution. (Ex. 18.) The new claims attempted to capture technology on the market and were like those Mr. Weiss's firm had prosecuted on behalf of Amazon. (Ex. 19.) The continuation applications ultimately issued as the asserted patents.

Mr. Weiss testified that he knew that the '291 application went abandoned but (mistakenly) believes that his knowledge does not matter. (Weiss Depo. at 105:15-18, 129:12-130:7.) Mr. Douer refused to testify in this case. Freshub disclosed him as a witness knowledgeable about the '291 application in its initial disclosures and stated in those disclosures that Freshub's counsel in this case, Kramer Levin, represented him. (Ex. 42 (Freshub June 26, 2020 Initial disclosures).) But when Amazon requested Kramer Levin accept service of a deposition subpoena, Kramer Levin refused to do so. (Ex. 43.) Mr. Douer then proceeded to evade service. On January 11, 2021, a woman at Mr. Douer's home explained that he was in the shower. (Ex. 44 (Jan. 25, 2021 Non-Service Report).) Two days later the doorman at the same building claimed that Mr. Douer no longer lived at that address. (*Id.* (Jan. 26, 2021 Non-Service Report).) And three days after that, a doorman stated that Mr. Douer was not available, apparently confirming that he still resided there. (*Id.*) In all, Amazon made ten attempts to serve Mr. Douer at his home and seven attempts to serve him at his office. (Exs. 44-45.) ████████████████████████████████████████████████████████████████████████████████████████████████ Once Freshub and its counsel learned that Amazon was attempting to depose Mr. Douer, they served amended initial disclosures removing him from their witness list, and then claimed that Kramer Levin never represented him. (Exs. 43, 46.)

III.   **ARGUMENT**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014). "To prove inequitable conduct, the challenger must show by clear and convincing evidence that the patent applicant (1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the PTO." *In re Rosuvastatin Calcium Patent Litig.*, 703 F.3d 511, 519 (Fed. Cir. 2012). Inequitable conduct may involve actions by both "the patentee and the attorney who prosecuted the application that resulted in the patent-in-suit, because the knowledge and actions of applicant's attorney are chargeable to [the] applicant." *Barry v. Medtronic, Inc.*, 245 F. Supp. 3d 793, 801 (E.D. Tex. 2017), *aff'd*, 914 F.3d 1310 (Fed. Cir. 2019), *cert. denied*, 140 S. Ct. 869 (2020).

### A. The statement that Ikan never intended to abandon the '291 application was material to the Patent Office's decision to revive that application.

"To establish materiality, it must be shown that the [Patent Office] would not have allowed the claim but for the nondisclosure or misrepresentation." *Rosuvastatin*, 703 F.3d at 519 (cleaned up). A misrepresentation of the applicant's intentional abandonment of an application is material to the Patent Office's determination of whether to revive it. *In re Rembrandt Techs. LP Patent Litig.*, 899 F.3d 1254, 1273 (Fed. Cir. 2018). Indeed, the Patent Office will not revive an intentionally abandoned application. 37 C.F.R. § 1.137(a). And to remove any doubt that Mr. Weiss' statement in the revival petition was material in this case, the Patent Office explicitly stated that given the length of the abandonment, it had relied "on the petitioner's duty of candor and good faith and accepting the statement that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to 37 C.F.R. 1.137 was unintentional." (Ex. 17 at KNOBBE-000704.) The Patent Office simply would not have agreed to revive the '291 application had it not been for Mr. Weiss's representation on behalf of Ikan that the entire period of abandonment was unintentional.

### B. Ikan's statement that its entire five-year delay in responding to the June 2011 office action was "unintentional" was false.

"Where the applicant deliberately permits an application to become abandoned (e.g., due to a conclusion that the claims are unpatentable, that a rejection in an Office action cannot be overcome, or that the invention lacks sufficient commercial value to justify continued prosecution), the abandonment of such application is considered to be a deliberately chosen course of action, and the resulting delay cannot be considered as 'unintentional' . . . ." M.P.E.P. § 711.03(c), (II)(C)(1); *In re Rembrandt Techs. LP Patent Litig.*, 899 F.3d at 1272-73 (citing Changes to Patent Practice and Procedure, 62 Fed. Reg. 53,132, 53,158–59 (Oct. 10, 1997)).  As the Federal Circuit has made clear, an applicant's mistake about commercial value or Patent Office procedure does not make an otherwise deliberate decision to abandon "unintentional."  *Id.*  Similarly, abandonment "is not rendered unintentional when, upon reconsideration, the applicant changes his or her mind as to the course of action that should have been taken."  M.P.E.P. § 711.03(c), (II)(C)(1). And delaying revival "by a deliberately chosen course of action, until the industry or a competitor shows an interest in the invention is the antithesis of an 'unintentional' delay."  *Id.*, (II)(D).

Ikan's statement to the Patent Office that the entire period of abandonment was "unintentional" was false, because Mr. Weiss and Ikan made a deliberate decision to abandon the '291 application.  The Patent Office issued a final rejection of the claims and then a Notice of Abandonment. (Exs. 3, 5.) Mr. Weiss confirmed that he received both these notices for Ikan, and that thus knew the application had become abandoned. (Weiss Dep. at 91:15-92:8; 93:2-7.) He also testified that his firm's practice is to send these communications to the client and to request the client's permission to abandon an application. (*Id.* at 91:15-92:4.) A few months after receiving the Notice of Abandonment, Mr. Weiss prepared the assignment document that the inventor Mr. Douer signed before a notary, confirming *in writing* their knowledge that the '291 application was

7

abandoned. (Ex. 6.)[3] Thus, in 2012 both Mr. Weiss and Mr. Douer knew that the '291 application became abandoned. *See Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995) (the knowledge of an applicant's representative is chargeable to the applicant); *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 n.8 (Fed. Cir. 1987) (same).

Both Mr. Weiss and Mr. Douer then permitted the '291 application to remain abandoned for years while focusing on prosecution of other Ikan patent applications. (Exs. 26-31; Weiss Dep. at 138:24-139:2, 141:6-22.) Ikan only attempted to revive the '291 application after Mr. Weiss's firm had prosecuted patents for Amazon in the voice shopping market and Amazon had emerged as a major force in the same market, indicating that Ikan's previously cancelled voice-shopping claims might have some commercial value. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Mr. Weiss's statement that the entire period of abandonment was "unintentional" was false. *See Rembrandt*, 899 F.3d at 1272-73.[4]

### C. Ikan made the false material statement to deceive the Patent Office.

A patentee's actions "constitute material misrepresentation with intent to deceive" so long as the "intent to deceive the PTO [is] the single most reasonable inference able to be drawn from the evidence." *Id.* at 1273 (citation omitted). "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Therasense, Inc. v.*

---

[3] In *Rembrandt*, the Court considered a similar document—a spreadsheet exchanged between the patentee and assignee plaintiff that identified one of the patents as abandoned—and held that sufficed to charge the plaintiff with knowledge of the patentee's fraud because the plaintiff had failed to investigate the circumstances of the abandonment. 899 F.3d at 1275.

[4] The only explanation Freshub (which is presently owned by Ikan) offered in discovery as the purported reason for the abandonment is a claim that Ikan was changing its business and simply did not realize that the prosecution of the '291 application had lapsed. (Ex. 25 (Response to Rog 15); Dkt. 30 (Freshub Amended Complaint ¶ 1) (confirming Ikan ownership of Freshub).) Freshub has no evidence to support this claim, and Mr. Weiss's testimony and Mr. Douer's assignment document transferring the abandoned application belie this assertion.

8

*Becton, Dickinson & Co*. 649 F.3d 1276, 1290 (Fed. Cir. 2011). Put another way, intent to deceive can be "inferred from the facts and circumstances surrounding the applicant's overall conduct." *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1345 (Fed. Cir. 2007) (citation omitted).

Here, the single most reasonable inference that can be drawn from the evidence is that Ikan misrepresented the abandonment in order to induce the Patent Office to grant the petition to revive. Mr. Weiss knew that intentional abandonment is a bar to revival and that he could not successfully revive the application for his client without attesting that the entire period of abandonment was unintentional. (Weiss Dep. at 122:2-123:9.) He also knew the application was abandoned for years. (*Id.* at 119:8-16.) He went ahead and made the false statement anyway.

Mr. Weiss has testified that he believed that he could still swear to the Patent Office that the entire period of abandonment was "unintentional" because only Ikan's deliberate permission to abandon mattered, not his own as Ikan's agent. (*Id.* at 129:12-130:24 ("it goes to the client's intent, or lack thereof, to abandon the application, not my knowledge of whether the application was abandoned or not").) But Mr. Weiss already knew that *Mr. Douer knew* that the application was abandoned because Mr. Weiss himself prepared and recorded at the Patent Office the document that Mr. Douer signed acknowledging that fact. (*Id.* at 101:25-102:7, 103:3-19, 103:23-104:2.) And Mr. Weiss could not testify to anything else he had done to *investigate* Mr. Douer's intent before swearing that the abandonment was unintentional. *See* 37 C.F.R. § 11.18(b)(2) (petitioner must make a reasonable inquiry before certifying statements to the Patent Office). Ikan bears responsibility for this deceit by its prosecuting attorney—it cannot draw a distinction between what its counsel knew and did and what Mr. Douer knew. *See Barry*, 245 F. Supp. 3d at 801; *Molins*, 48 F.3d at 1178; *FMC Corp.*, 835 F.2d at 1415 n.8.

Mr. Weiss could not testify to *any fact* that would show the entire period of abandonment was unintentional, nor could he testify to *any step* he took to "investigate" to ensure he did not

9

perjure himself in the revival petition. He testified that his firm obtains and memorializes the client's express approval before allowing *any* application to go abandoned, but said he could not recall if he had ever checked whether his firm's docketing system showed Ikan's approval to abandon the '291 application. (Weiss Dep. at 137:17-138:23.) Mr. Weiss refused to answer other questions about his preparation of the revival petition on privilege grounds. (*Id.* at 128:9-129:1.) As a result, there is no record evidence that Mr. Weiss performed any investigation that would support his sworn statement, let alone evidence showing investigation of the entire five-year period of abandonment required by 37 C.F.R. § 1.137(a).

Mr. Weiss' failure to investigate *alone* is enough to support summary judgment of intent to deceive. In *3D Med. Imaging Systems, LLC v. Visage Imaging, Inc.*, 228 F. Supp. 3d 1331 (N.D. Ga. 2017), the patentee decided to abandon a patent by not paying a maintenance fee and confirmed that it would be doing so in an email with patent counsel. *Id*. at 1334. Following a bankruptcy, a company called MedFlex acquired the patent and petitioned the Patent Office to revive, knowing that the patentee had not paid. *Id*. at 1334-1335. The district court held on summary judgment that a statement the abandonment was "unintentional" in the request for revival was made with the intent to deceive the Patent Office, because MedFlex had not investigated the reasons for the original abandonment. *Id.* at 1339. The single most reasonable inference from the evidence was therefore that MedFlex intended to deceive the Patent Office. *Id.* Here, again, Mr. Weiss could not identify any step he had taken to investigate whether his statement was true or false before he swore to it under penalty of perjury, and in fact he had *express knowledge* that Mr. Douer had confirmed the abandonment in the assignment document.

Summary judgment of inequitable conduct is appropriate because the Court will hear no other evidence regarding Ikan's intent to abandon the '291 application, as neither Mr. Weiss nor Mr. Douer will testify at trial. Freshub's principal witnesses lack personal knowledge: Mr. Zohar,

10

Freshub's CEO, had no relationship with Ikan when the '291 application went abandoned and was not involved with its prosecution. (Zohar Dep. at 307:9-308:18.) William Adam, a former Ikan employee whom Freshub intends to call at trial, and who began consulting for Freshub in 2019, testified that he never discussed revival of the '219 application before his consultancy began. (Ex. 20 (Adam Dep.) at 56:11-15.) There is therefore no witness who can testify in support of Freshub's bald claim that the '291 application went abandoned through inadvertence, let alone any witness who can contradict Mr. Weiss's testimony that he knew the original circumstances of abandonment but submitted the (false) sworn statement anyway.[5]

### D. Ikan's inequitable conduct during the prosecution of the '291 application infects the continuation patents in this case.

Inequitable conduct related to one patent or application will render continuation and related patents unenforceable where the prosecution histories and the conduct at issue have an immediate and necessary relation to the equity sought. *Consol. Aluminum Corp. v. Foseco Int'l, Ltd.*, 910 F.2d 804, 810 (Fed. Cir. 1990) (citation omitted); *see also Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006) (affirming ruling of unenforceability of continuation patent based on inequitable conduct with respect to parent patent); *Fox Indus. v. Structural Pres. Sys.*, 922 F.2d 801, 803-04 (Fed. Cir. 1990) ("a breach of the duty of candor early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application").

In *Consolidated Aluminum*, for example, the invention concerned ceramic foam filters for molten metal. The inventors concealed the best mode, a particular slurry used for the ceramic foam, and disclosed a fictitious, inoperable mode that omitted key ingredients from the slurry.

---

[5] *Rembrandt* concerned a finding of inequitable conduct after trial, but a trial was necessary in that case due to the need to resolve the conflict between the patentee's testimony about misunderstanding Patent Office procedure concerning missed payments and the evidence showing that it understood that missed payments would forfeit the patents. 899 F.3d at 1274.

11

They then filed continuations that incorporated the withheld best mode. 910 F.2d at 809. The Federal Circuit determined that there was more than a mere relatedness in subject matter and the prosecution history established that the patentee's inequitable conduct in prosecuting the original patent had "immediate and necessary relation" to the enforcement of the continuation patents, and thus made them unenforceable *Id*. at 810-811.

In *Agfa*, the invention concerned a "computer-to-plate" printing system. The applicant withheld prior art that established a *prima facie* case of unpatentability of the asserted patents and contradicted positions the applicant had taken during prosecution. 451 F.3d at 1379. The Federal Circuit affirmed the district court's unenforceability ruling also as to a continuation patent, noting that it was a continuation, not a divisional, and that the patentee made no argument suggesting its subject matter was sufficiently distinct from the parent patent to require different treatment. *Id.*

Here, Ikan could not have filed the continuation applications (or otherwise claimed priority to the parent application filing date) without first reviving the '291 application. M.P.E.P. § 201.07 ("At any time before the patenting, abandonment, or termination of proceedings on an earlier application, an applicant may have recourse to filing a continuation application under 37 C.F.R. § 1.53(b) in order to introduce into the application a new set of claims . . . ."). The asserted patents therefore would not exist if not for the claim that Ikan's abandonment was "unintentional," made to achieve revival of the '291 application. Under such circumstances, the inequitable conduct in the prosecution of the parent extends to the continuation patents, as their enforcement has an "immediate and necessary relation" to the misconduct. The patents asserted in this case are therefore unenforceable due to the inequitable conduct committed during prosecution of their parent.

## IV. CONCLUSION

For the foregoing reasons, the Court should grant summary judgment of inequitable conduct in the prosecution of the asserted patents and hold each of them unenforceable.

| | |
|---|---|
| Dated: March 26, 2021 | Respectfully submitted, |
| | /s/ Saina S. Shamilov |

<div style="display:flex">

*Of Counsel:*

Barry K. Shelton (TX Bar #24055029)
bshelton@sheltoncoburn.com
Bradley Dalton Coburn
coburn@sheltoncoburn.com
SHELTON COBURN LLP
311 RR 620 S, Suite 205
Austin, TX 78734
Tel: (512) 263-2165
Fax: (512) 263-2166

J. David Hadden, (CSB No. 176148)
Email: dhadden@fenwick.com
Saina S. Shamilov, (CSB No. 215636)
Email: sshamilov@fenwick.com
Todd R. Gregorian (CSB No. 236096)
Email: tgregorian@fenwick.com
Ravi R. Ranganath (CSB No. 272981)
Email: rranganath@fenwick.com
Allen Wang (CSB No. 278953)
Email: allen.wang@fenwick.com
Eric B. Young (CSB No. 318754)
Email: eyoung@fenwick.com
**FENWICK & WEST LLP**
Silicon Valley Center
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200

*Counsel for Defendants*
*AMAZON.COM, INC., AMAZON.COM*
*SERVICES LLC, PRIME NOW, LLC, and*
*WHOLE FOODS MARKET SERVICES, INC.*

</div>

## CERTIFICATE OF SERVICE

The foregoing document was filed under the Court's CM/ECF system, automatically effecting service on counsel of record for all other parties who have appeared in this action on the date of such service.

>                     */s/ Saina S. Shamilov*
>                       Saina S. Shamilov